239 P.3d 1148 (2010)
Christa L. ALBICE, a married woman, and Bart A. Tecca and Karen L. Tecca, husband and wife, Appellants,
v.
PREMIER MORTGAGE SERVICES OF WASHINGTON, INC., a Washington Corporation; Option One Mortgage Corporation, a California Corporation; Defendants,
Ron Dickinson and Jane Doe Dickinson, husband and wife, Respondents.
Ron Dickinson, Respondent,
v.
Christa L. Albice f/k/a Christa L. DeYoung; Bart A. Tecca and Karen L. Tecca, husband and wife; Any Subtenants, and All Others Acting By or Through Them, Appellants.
No. 39265-8-II.
Court of Appeals of Washington, Division 2.
September 28, 2010.
*1151 Douglas N. Kiger, Jonathan W. Blado, Blado Kiger PS, Tacoma, WA, for Appellants.
Richard L. Ditlevson, Ditlevson Rodgers Dixon PS, Olympia, WA, for Respondents.
ARMSTRONG, J.
¶ 1 Christa Albice and Karen and Bart Tecca (Albice/Teccas) appeal the trial court's refusal to set aside a nonjudicial deed of trust foreclosure sale of their property. They argue that (1) the successful bidder at the foreclosure sale was not a bona fide purchaser; (2) even if he was, the trustee's deed failed to report procedural facts that would statutorily protect a buyer; (3) the sale was void for taking place beyond the statutorily limited timeframe; (4) the Teccas timely tendered funds sufficient to cure the loan default and require the trustee to discontinue the sale; and (5) the trustee lacked authority to conduct the sale because it had no corporate officer residing in Washington at the time of the sale. We hold that the sale did not comply with statutory requirements, that the purchaser was not a bona fide purchaser for value, that the trustee's deed failed to state facts that would protect a buyer, that the sale price was inadequate, and that the sale was surrounded by other unfair circumstances. Accordingly, we reverse.

FACTS

A. Background

¶ 2 Christa Albice and Karen and Bart Tecca owned improved real property on Hartstine Island in Mason County. Sisters Albice and Tecca inherited the 10-acre property from their parents free of any liens or encumbrances.
¶ 3 In 2003, the Teccas borrowed $115,500 against the property secured by a deed of trust. The loan was serviced through a subsidiary of H & R Block known as Option One Mortgage Corporation (Option One). Premier Mortgage Services of Washington (Premier), also a subsidiary of H & R Block, was the trustee of the deed of trust.[1]
¶ 4 The Teccas fell delinquent on their loan payments to Option One in April 2006. Premier issued a Notice of Foreclosure and a Notice of Trustee Sale, informing the Teccas that it would hold a foreclosure sale on September 8, 2006. The Teccas contacted Option One to find out how to cure the delinquent payments and avoid foreclosure.
¶ 5 In July 2006, the Teccas and Option One entered into a forbearance agreement. The agreement stated that the Teccas owed $5,126.97 to bring the loan current. The Teccas agreed to a down payment of $3,000.00 and increased monthly payments, to be paid by the 16th of every month, through January 2007. On September 8, 2006, the crier of the sale announced that Premier was postponing the foreclosure sale.[2]
¶ 6 The Teccas made the down payment and, although late, made each of the subsequent monthly payments. The Teccas tendered the final payment, which was due on January 16, on February 2, 2007. On February 10, 2007, they received notice from Western Union that Option One had refused to accept their final payment. Western Union refunded the final payment on February 16, 2007.[3]
*1152 ¶ 7 On February 16, 2007, Premier conducted a foreclosure sale of the property, 161 days after the original sale date set in the Notice of Trustee Sale. Through an agent, Ron Dickinson successfully bid $130,000 for the property.

B. Procedural History

¶ 8 Albice/Teccas sued Premier, Option One, and the Dickinsons, seeking to set aside the foreclosure sale. They alleged that Option One breached the forbearance agreement with the Teccas and that Premier breached its fiduciary duty owed to the Teccas and conducted an improper foreclosure sale. Against the Dickinsons, Albice/Teccas sought to quiet title to the property. The Dickinsons counterclaimed to quiet title and filed cross-claims against Option One and Premier.[4]
¶ 9 The Dickinsons moved for summary judgment to establish that Ron Dickinson was a bona fide purchaser of the property and therefore entitled to quiet title. Albice/Teccas also moved for summary judgment, arguing that the foreclosure sale should be set aside as void because (1) Premier was not a qualified trustee with authority to conduct the sale and (2) the sale occurred after the statutory deadline. The trial court granted the Dickinsons' motion, ruling that Ron Dickinson was a bona fide purchaser for value. The court held that even though the sale was continued for more than 120 days in violation of RCW 61.24.040(6), Ron Dickinson's bona fide purchaser status rendered the deed's recitals of compliance with the statute conclusive evidence that the sale was proper.
¶ 10 After two rulings on Premier's qualification to act as a trustee in Washington State and subsequent motions for reconsideration, the parties tried the issue. Following a bench trial, the court ruled that Premier was eligible to serve as a trustee under Washington law. Accordingly, the court quieted title in favor of the Dickinsons and awarded them damages and costs.

ANALYSIS

I. Washington Deed of Trust Act
¶ 11 The Deeds of Trust Act (Act) sets out the procedures that must be followed to properly foreclose a debt secured by a deed of trust. Chapter 61.24 RCW. A proper foreclosure action extinguishes the debt and transfers title to the property to the beneficiary of the deed of trust or to the successful bidder at a public foreclosure sale. In re Marriage of Kaseburg, 126 Wash.App. 546, 558, 108 P.3d 1278 (2005).
¶ 12 We construe the Act to further three objectives: (1) the nonjudicial foreclosure process should remain efficient and inexpensive; (2) the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure; and (3) the process should promote the stability of land titles. Cox v. Helenius, 103 Wash.2d 383, 387, 693 P.2d 683 (1985). In addition, because nonjudicial foreclosures lack the oversight inherent in judicial foreclosures, we strictly apply and interpret the Act in the borrower's favor. CHD, Inc. v. Boyles, 138 Wash.App. 131, 137, 157 P.3d 415 (2007).
¶ 13 A lawful foreclosure sale must comply with the timing and notice obligations of RCW 61.24.040. For example, a trustee may, for any cause the trustee deems advantageous, continue the sale for not more than a total of 120 days. RCW 61.24.040(6). And at any time prior to the 11th day before the sale, the borrower is entitled to cure the default set forth in the notice. RCW 61.24.090(1). Upon receipt of such payment, the trustee must discontinue the sale and reinstate the deed of trust. RCW 61.24.090(3).
¶ 14 To balance the procedural safeguards with the interests of a purchaser, the Act requires a foreclosing trustee to issue a deed that recites facts showing that the sale was conducted in compliance with statutory requirements. RCW 61.24.040(7). A bona fide purchaser is entitled to rely on these recitals as to the correctness of foreclosure *1153 sale procedures. RCW 61.24.040(7); Glidden v. Mun. Auth. of Tacoma, 111 Wash.2d 341, 347, 758 P.2d 487 (1988).

II. Statutory Defects in the Sale
¶ 15 Albice/Teccas argue that the trustee's failure to comply with certain statutory requirements renders the sale void. First, they claim that Premier had no authority to conduct the sale 161 days after the original sale date under RCW 61.24.040(6). Next, they claim that because they tendered funds sufficient to cure the default, the trustee should have discontinued the sale under RCW 61.24.090(3).[5] In addition, they assert that the recitals contained in the trustee's deed are "inadequate to demonstrate compliance with the statute." Br. of Appellant at 15, 18.
¶ 16 The Dickinsons counter that as bona fide purchasers for value, they are protected by the recitals in the deed of trust, which serve as conclusive evidence of a procedurally correct sale under RCW 61.24.040(7).[6]
¶ 17 We hold that the conclusional recitals in the deed of trust do not protect the Dickinsons from undisputed defects in the sale because they do not meet the statutory requirement of "facts showing" compliance with chapter 61.24 RCW. In addition, regardless of the sufficiency of the recitals, we hold that Dickinson was not a bona fide purchaser entitled to protection under RCW 61.24.040(7).

A. Standard of Review

¶ 18 On summary judgment, the trial court ruled that even though the sale was continued for more than 120 days in violation of RCW 61.24.040(6), Dickinson's bona fide purchaser status rendered the deed's recitals conclusive evidence that the sale was proper. We review a summary judgment de novo. Hisle v. Todd Pacific Shipyards Corp., 151 Wash.2d 853, 860, 93 P.3d 108 (2004). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts and reasonable inferences from them in the light most favorable to the nonmoving party. City of Lakewood v. Pierce County, 144 Wash.2d 118, 125, 30 P.3d 446 (2001). The trial court can grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).

B. Sufficiency of Recitals

¶ 19 The trustee's deed recites information about the underlying debt obligation, the failure to cure the default, the lender's request to sell the property, and the fulfillment of notice requirements prior to the sale. The deed also recites that "[a]ll legal requirements and all provisions of said Deed of Trust have been complied with, as to acts to be performed and notices to be given, as provided in Chapter 61.24 RCW." CP at 450.
¶ 20 Notably absent in the trustee's deed is any mention of the six continuances. Although the original sale date was September 8, 2006, the trustee's deed states that the original sale date on the Notice of Trustee Sale was "02/16/2007" (which was the actual sale date). CP at 444, 450. Nor does the trustee's deed mention the forbearance agreement or any of the make-up payments, including the tender of the last payment, which although late, would have cured the *1154 original default if accepted. The trustee's deed tells none of this story, reciting simply that "[a]ll legal requirements and all provisions of [Chapter 61.24 RCW] have been complied with" and that the original default had not been cured more than 11 days before the final sale.[7] CP at 450. These conclusional recitals make it impossible to determine, as a matter fact, whether the sale took place within the statutorily required time or whether the borrowers were actually in default at the time of the sale.

1. Purpose of Recitals
¶ 21 We construe a statute to give effect to the legislature's intent. Udall v. T.D. Escrow Serv., Inc., 159 Wash.2d 903, 909, 154 P.3d 882 (2007). Where the statute's words are plain and unambiguous, we apply the statute as written. Enter. Leasing, Inc. v. City of Tacoma, 139 Wash.2d 546, 552, 988 P.2d 961 (1999). We also, when possible, give effect to every word, clause, and sentence of a statute. Cox, 103 Wash.2d at 387, 693 P.2d 683. In the absence of a term's statutory definition, we give the term its plain and ordinary meaning ascertained from a standard dictionary. Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004).
¶ 22 The Act requires the foreclosing trustee to issue to the purchaser a deed that:
shall recite the facts showing that the sale was conducted in compliance with all of the requirements of this chapter and of the deed of trust, which recital shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value[.]
RCW 61.24.040(7) (emphasis added). Webster's Dictionary defines "recital" as "the formal statement or setting forth of some relevant matter of fact in a deed or legal document." Webster's Third New Int'l Dictionary at 1895 (2002). The statute unambiguously requires the trustee to recite facts in its deed showing compliance with the requirements of the chapter. Legal conclusions without supporting facts are insufficient to demonstrate that the sale complied with all the statutory procedural protections.
¶ 23 The Dickinsons point to the fact that the recitals contained in the trustee's deed are virtually identical to the form deed recommended by the Washington State Bar Association in the Washington Real Property Deskbook, 3d Ed. (Wash. State Bar Ass'n. Supp.2001), § 47.11(16). The deskbook, however, is not authority we are bound to follow. Had the trustee correctly identified the original sale date on the Notice of Sale, the deed would have contained inconsistent recitals that the sale was continued for a period exceeding 120 days contrary to, not in compliance with, the terms of the statute. And had the trustee reported that Option One and the Teccas had executed a forbearance agreement under which the Teccas had actually paid all or most of the original delinquency, the recitals would have been, at the very least, seriously misleading as to whether the original default had been cured.[8] California courts have held that where recitals of regularity appear on the face of the deed but the deed also sets forth facts which are inconsistent with that recital, the deed is void on the basis that the recitals are not valid. Dimock v. Emerald Props. LLC, 81 Cal. App.4th 868, 877, 97 Cal.Rptr.2d 255 (2000) (citing Little v. CFS Serv. Corp., 188 Cal. App.3d 1354, 1359, 233 Cal.Rptr. 923 (1987)). We agree with this reasoning. We are unwilling to accept a trustee's legal conclusions contrary to the actual facts of the foreclosure process as conclusive evidence where an accurate reporting of the facts would have shown the legal conclusions to be incorrect.
*1155 ¶ 24 Moreover, a trustee's bald statements that he or she has complied with the law, as distinguished from recitals of fact demonstrating such compliance, tend to dilute the statutory protections afforded borrowers by the Act.[9]See Rosenberg v. Smidt, 727 P.2d 778, 786 (Alaska 1986). While the purpose of RCW 61.24.040(7) is to enhance the reliability of land titles, conclusional recitals do so at the borrowers' expense. A conclusional recital in a trustee's deed requires little effort or oversight by the trustee yet it severely limits a borrower's ability to obtain post-sale relief. Rosenberg, 727 P.2d at 786 (noting that although factual recitals do not always protect against fraud, they tend to prevent more common failings of oversight and neglect). In contrast, requiring the trustee to recite the statutorily mandated facts of the loan-default procedure strikes the appropriate balance between the competing interests of all the parties. Where, as here, the deed contains legal conclusions but not factual recitals that establish compliance with RCW 61.24.040(7), we decline to extend protection to a purchaser beyond what the legislature clearly intended. We emphasize that the problem here is not that the recitals are wrong or misleading; rather, it is the trustee's failure to recite any facts triggering the protections afforded by chapter 61.24 RCW. We hold that the Dickinsons are unable to claim the protections of RCW 61.24.040(7); i.e., that the trustee's sale occurred within the statutorily required time and that the original defaults had not been cured. We next consider whether at least one of these flaws renders the sale void.

2. Sale Void Beyond 120 Days
¶ 25 The Dickinsons argue that the original sale was suspended subject to the forbearance agreement between the Teccas and Option One and that this does not violate the statute, which prohibits a trustee from continuing a sale for more than 120 days. Indeed, the forbearance agreement contains the following provision:
In the event that a foreclosure action is pending relating to the Loan at the time this Agreement becomes effective ... the foreclosure action will not be dismissed, but the Lender shall use its best efforts to ensure that the foreclosure is placed on hold pending satisfaction by Borrowers of the terms of this Agreement. Lender shall retain the right to continually postpone the foreclosure ... or otherwise take any action reasonably necessary to maintain the "pending" status of the foreclosure action during the term of this Agreement.
CP at 467. Each time the sale was continued, the crier of the sale attributed the postponement to a "mutual agreement." CP at 358-59.
¶ 26 RCW 61.24.040(6) grants a trustee authority to continue a sale for any cause the trustee deems advantageous. Wells Fargo Bank Minnesota v. Vincent, 124 Wash.App. 1, 3-4, 93 P.3d 173 (2004). In Vincent, the court reasoned that the statute's plain language renders immaterial a trustee's reliance on "mutual agreement" when postponing a sale. Vincent, 124 Wash.App. at 4 n. 5, 93 P.3d 173. There, the court held that absent an agreement to the contrary, the terms of the statute granted the trustee authority to continue the sale. Vincent, 124 Wash.App. at 3-4, 93 P.3d 173. Here, the Teccas did not contest Premier's or Option One's ability to continue the sale. Following Vincent, without an agreement restricting continuances of the sale, the grounds for continuing the sale were immaterial under the trustee's statutory authority.[10] We next consider whether the 120-day limit in RCW 61.24.040(6) divests a trustee of all authority *1156 to sell the property such that a sale after the 120 days is void.
¶ 27 A plain reading of the statute unambiguously limits what is otherwise unfettered discretion of the trustee to continue a sale. RCW 61.24.040(6) (trustee may "continue the sale for a period or periods not exceeding a total of one hundred twenty days") (emphasis added). Thus, one factor courts address in determining the validity of a sale is whether the sale occurred within 120 days. In Felton v. Citizens Federal Savings and Loan Association of Seattle, 101 Wash.2d 416, 424-25, 679 P.2d 928 (1984), although the trustee sale occurred more than three months after it was originally scheduled, in breach of an agreement, the court upheld the validity of the sale because the borrowers requested the delay and the sale occurred within the 120 days allowed by RCW 61.24.040(6). See also In re Bell, 386 B.R. 282, 289 (2008) (holding that a trustee sale postponed by oral notice complied with the Act where it was continued by public proclamation for less than a total of 120 days). Conversely, in Bingham v. Lechner, 111 Wash.App. 118, 131, 45 P.3d 562 (2002), the court addressed the effect of exceeding the 120-day limit. There, the trustee argued that the statute of limitations on enforcing payment of a loan did not bar him from reinstituting foreclosure proceedings. Bingham, 111 Wash.App. at 127-28, 45 P.3d 562. He claimed that the statute of limitations tolled, and never restarted, when the original foreclosure proceedings were initiated. Bingham, 111 Wash.App. at 127, 45 P.3d 562. The court, relying on RCW 61.24.040(6), held that the trustee was entitled to continue the initial sale for 120 days, during which time the statute of limitations tolled. Bingham, 111 Wash.App. at 131, 45 P.3d 562. But the court concluded that after 120 days, the trustee's right to conduct the original sale extinguished, restarting the statute of limitations. Bingham, 111 Wash.App. at 131, 45 P.3d 562. We agree that this provision divests a trustee of authority to conduct a sale more than 120 days from the date in the Notice of Sale.
¶ 28 In the absence of specific facts in the trustee's deed showing that the trustee held the sale within 120 days, including continuances, RCW 61.24.040(7) does not protect Dickinson from a showing to the contrary. The trustee held the sale 161 days after the date set forth in the Notice of Trustee Sale, well beyond the statutorily mandated 120-day limit. Accordingly, the sale was void.[11]

C. Bona Fide Purchaser Status

¶ 29 Even if the recitals were sufficient, Dickinson is unable to rely on the protection of RCW 61.24.040(7) because he was not a bona fide purchaser for value. Without such protections, the undisputed statutory defects in the sale, as demonstrated above, render the sale void.
¶ 30 Albice/Teccas argue that Dickinson was not a bona fide purchaser because (1) he knew or should have known about the defects in the sale and (2) the purchase price was substantially below the property's fair market value. Specifically, they argue the following circumstances gave Dickinson notice of flaws in the foreclosure proceedings: (1) Dickinson was "intimately familiar with real estate investment and the non-judicial foreclosure process"; (2) from experience, Dickinson knew foreclosure sales are usually continued for 30 days; (3) Dickinson spoke with Karen Tecca, who told him that they had no interest in selling, that the sale was not going to happen, and that they were "going to make up the payments"; and (4) Dickinson was "surprised" when the property came up for sale. Br. of Appellant at 19-20. Albice/Teccas further argue that a reasonably diligent inquiry would have revealed that the Teccas had entered into a forbearance agreement under which they had made all their payments and that the sale had been continued for a period beyond what was statutorily allowed.
¶ 31 The Dickinsons counter that postponing the sale beyond 120 days did not put Dickinson on notice of any procedural defects. They claim that Dickinson did not know, nor should he be expected to know, *1157 about the 120-day statutory limit on continuances. They also argue that Dickinson's conversation with Karen Tecca produced no information creating actual or constructive notice of defects in the sale process and that Tecca merely declined an offer to purchase the property.
¶ 32 A bona fide purchaser is one who purchases property without actual or constructive knowledge of competing interests and pays the vendor valuable consideration. Glidden, 111 Wash.2d at 350, 758 P.2d 487; Glaser v. Holdorf, 56 Wash.2d 204, 209, 352 P.2d 212 (1960). A purchaser is on notice if he has knowledge of facts sufficient to put an ordinarily prudent man on inquiry and a reasonably diligent inquiry would lead to the discovery of title or sale defects. Steward v. Good, 51 Wash.App. 509, 513, 754 P.2d 150 (1988) (citing Peterson v. Weist, 48 Wash. 339, 341, 93 P. 519 (1908)). We must therefore determine whether the events surrounding the sale created a duty on Dickinson's part to inquire into possible flaws in the foreclosure process. See Glidden, 111 Wash.2d at 350-51, 758 P.2d 487. A combination of factors convinces us that Dickinson had a duty to further investigate the circumstances of the sale.
¶ 33 We give substantial weight to a purchaser's real estate investment experience when determining whether a purchaser had inquiry notice. Compare Steward, 51 Wash.App. at 513, 754 P.2d 150 (noting that the bona fide purchasers had little real estate investing experience at the time of the sale) and Miebach v. Colasurdo, 102 Wash.2d 170, 176, 685 P.2d 1074 (1984) (holding that the purchaser with 23 years of investment experience was not a bona fide purchaser). Dickinson is in the business of investing in real estate. Of his 13 properties in Washington, he purchased the majority through nonjudicial foreclosure sales. By the time of the sale at issue, Dickinson had attended over 35 foreclosure sales. He stated that he had familiarized himself with various Washington foreclosure laws as a necessity for conducting his business. Thus, even without specific knowledge of statutory requirements for a proper sale, Dickinson's familiarity with the foreclosure process provides context for assessing whether certain facts put him on notice.
¶ 34 Before the actual sale, Dickinson approached Karen Tecca and asked if she was interested in selling him the property directly. According to Dickinson, Tecca responded that she was not interested in selling the property and never would be. In light of this conversation, Dickinson claimed that he was surprised when the property came up for auction. Moreover, on the original sale date, Dickinson learned that the sale was being continued; he obviously tracked the continuances through to the actual sale 161 days later. In Miebach, 102 Wash.2d at 176-77, 685 P.2d 1074, the purchaser drove by the sale property twice and once knocked on the door, noticing a permit for improvements on the door. The court found these circumstances, coupled with an inadequate purchase price, sufficient to alert a prudent purchaser of the need to further investigate the sale. Miebach, 102 Wash.2d at 176-77, 685 P.2d 1074. Dickinson's personal encounter with Karen Tecca should have similarly raised his suspicions regarding the circumstances of the foreclosure. That he was surprised when the property came up for auction reinforces our conclusion that Dickinson had a duty to confirm the status of the default.
¶ 35 Here too, the sale price was markedly low in comparison to the Albice/Teccas' substantial equity in the property.[12] A sale price less than the fair market *1158 value at a foreclosure proceeding is not an irregularity. See BFP v. Resolution Trust Corp., 511 U.S. 531, 538-39, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). But an inadequate purchase price can be a factor that puts a purchaser on notice of another party's claim of right to, or equity in, the property. See Casa del Rey v. Hart, 110 Wash.2d 65, 72, 750 P.2d 261 (1988); Miebach, 102 Wash.2d at 176-77, 685 P.2d 1074. The low auction price relative to the fair market value should have alerted Dickinson to the discrepancy between the underlying debt obligation and the Albice/Teccas' remaining equity in the property. That Dickinson evaluated the property at less than the Teccas' estimation does not relieve him of noting this considerable discrepancy. Dickinson's agent was authorized to spend up to $450,000 at the sale, yet he spent only $130,000.[13] Like the purchaser in Miebach, Dickinson was aware that he was paying only a fraction of the property's value. Thus, the low price was another factor that should have raised Dickinson's suspicions as a prudent investor.
¶ 36 Together, these facts created a duty on Dickinson's part to inquire into the legitimacy of the sale. A reasonably prudent real estate investor concerned with protecting his assets would have inquired into the particulars of the Teccas' default, especially with the knowledge that they had no intention of relinquishing their property. The long delay should have further alerted him that the Teccas were likely trying to cure the default on their loan and prevent a foreclosure. When Dickinson contacted the trustee to confirm the date of the sale, he could have easily also confirmed the circumstances of the default. As in Miebach, 102 Wash.2d at 177, 685 P.2d 1074, Dickinson's conduct does not match that of an ordinary prudent investor.
¶ 37 Once on inquiry notice, it is clear that Dickinson would have discovered serious defects in the foreclosure sale process. With reasonably diligent inquiry, he could have learned that the six continuances were a result of the Teccas' payments under a forbearance agreement and that they attempted to cure their default more than 11 days prior to the actual sale date. Accordingly, we hold that Dickinson is not a bona fide purchaser protected under RCW 61.24.040(7). Rather, he is bound by Albice/Teccas' uncontroverted evidence that the sale was conducted in violation of the Act.

III. Sale Void on Equitable Grounds
¶ 38 In addition, Albice/Teccas argue that the substantially inadequate sale price, in conjunction with unfair circumstances surrounding the sale, establishes equitable grounds to set aside the foreclosure sale.
¶ 39 Washington courts have not set a benchmark for when a foreclosure sale price is inadequate as a matter of law. In general, Washington courts have found the purchase price inadequate when it is less than 10 percent of the fair market value. See e.g., Miebach, 102 Wash.2d at 177-79, 685 P.2d 1074 (sale for less than 2 percent of the fair market value was a grossly inadequate sales price); Cox, 103 Wash.2d at 387-88, 693 P.2d 683 (purchase price between 3.9 and 5.9 percent of the fair market value was grossly inadequate); Casa del Rey, 110 Wash.2d at 72, 750 P.2d 261 (purchase for 4.9 percent of the fair market value was inadequate). The Restatement (Third) of Property states that a court is generally warranted in invalidating a sale where the price is less than 20 percent of fair market value. Restatement (Third) of Property: Mortgages § 8.3 cmt. b (1997). As noted above, Dickinson purchased the property for between 13 and 18 percent of its fair market value.
¶ 40 Inadequacy of price alone, however, is generally insufficient to set aside a nonjudicial foreclosure sale. Udall, 159 Wash.2d at 914-15, 154 P.3d 882. But a grossly inadequate purchase price together with circumstances of other unfair procedures may provide equitable grounds to set aside a sale. Udall, 159 Wash.2d at 914, 154 P.3d 882. Where violations of a sale are technical, a borrower must show that the *1159 circumstances surrounding the sale unfairly harmed or prejudiced the borrower. Steward, 51 Wash.App. at 515, 754 P.2d 150.
¶ 41 According to Albice/Teccas, the string of continuances chilled the bidding process, contributing to the substantially low sale price. At the initial sale, four or five bidders appeared; only two bidders appeared at the actual sale 161 days later. The crier of the sale commented that the sale was continued so many times that nobody thought it was going to happen. And the actual sale, originally scheduled for 10:00 a.m., was not held until 11:45 a.m. A trustee's actions that effectively suppress competitive bidding need not be intentional to warrant relief. See Country Express Stores, Inc. v. Sims, 87 Wash.App. 741, 748-49, 943 P.2d 374 (1997). Here, the trustee's continuances and delayed start of the actual bidding likely chilled the bidding process by reducing the number of potential bidders.[14] Dickinson paid only a fraction of the amount he was prepared to pay, suggesting he would have paid more had the bidding been competitive.
¶ 42 More importantly, circumstances surrounding the default and the Teccas' attempts to save their substantial equity in the property constitute unfair circumstances warranting the setting aside of the sale on equitable grounds. In Cox, 103 Wash.2d at 386, 693 P.2d 683, the trustee conducted the sale even though he had actual notice of a pending action where the borrowers were challenging their underlying debt obligation. The court reasoned that given his fiduciary duties to both the borrower and the lender, the trustee should have informed the borrower's attorney that she had failed to properly restrain the sale until resolution of the underlying dispute. Cox, 103 Wash.2d at 390, 693 P.2d 683. The court held that the trustee's action, along with the inadequate purchase price, resulted in grounds to set aside the sale. Cox, 103 Wash.2d at 388, 693 P.2d 683.
¶ 43 Here, the Teccas tendered the final payment under the forbearance agreement on February 2, 2008, more than 11 days before the sale on February 16, 2008. Although this amount may not have been sufficient to automatically discontinue the sale under RCW 61.24.090(3),[15] it was sufficient to require that Premier, as a fiduciary to both the lender and Albice/Teccas, cancel the sale, give the Teccas notice of any additional costs due, and reschedule the sale with additional public notices.[16] The harm to the lender would be minimal in again delaying the sale. The harm to Albice/Teccas in proceeding with the sale was enormousthe loss of $300,000-$800,000 of equity in the property. A trustee is not required to obtain the best possible price for the trust property; nonetheless, a trustee must take reasonable and appropriate steps to avoid sacrificing the debtor's interest in the property. Cox, 103 Wash.2d at 389, 693 P.2d 683. Here, the trustee acted with complete disregard for the Albice/Teccas' substantial interest in the property. We have no hesitation in holding that under Cox, these circumstances more than warrant setting aside the nonjudicial foreclosure sale. We vacate the trial court's order approving the sale and remand for the *1160 trial court to enter an order declaring the sale void.

IV. Attorney Fees
¶ 44 Finally, Albice/Teccas argue that if we find that the trustee's sale was void, the judgment entered for rent, costs, and statutory attorney fees should be reversed. RCW 59.12.170 provides that the court shall assess damages occasioned by an unlawful detainer. Costs, including statutory attorney fees, are awarded to a prevailing party pursuant to RCW 4.84.010. Because we have set aside the sale as void, we also reverse the trial court's judgments for rent, costs, and statutory attorney fees in favor of Dickinson. We award costs and fees to Albice/Teccas as the prevailing party. RCW 4.84.010.
¶ 45 We reverse.
We concur: PENOYAR, C.J., and WORSWICK, J.
NOTES
[1] The exact nature of the relationship between Option One and Premier is unclear. The trial court concluded that Option One was affiliated with Premier. Our reading of the record suggests an even stronger connection. Lisa Clary, an Option One employee designated as the representative of Premier in this action, described Premier as Option One's "in-house trust deed service," handling all of Options One's foreclosures in Washington State at the relevant time. Clerk's Papers (CP) at 239-56. She explained that Option One monitored Premier's work and that both corporations accessed all loan information from a shared database. Michael Crockett, a licensed private investigator, stated that Premier is actually Option One.
[2] The sale was continued six times before the final sale took place.
[3] According to legal counsel for Option One, a letter was sent to the Teccas on January 31, 2007, declaring breach of contract for nonpayment under the terms of the forbearance agreement and notifying them that the foreclosure proceedings would continue without further demand. Karen Tecca claims she never received written notice that they were in breach of contract.
[4] The trial court dismissed Albice/Teccas' claims against Premier and Option One because of an arbitration agreement the Teccas signed. The trial court granted the Dickinsons' motion to voluntarily dismiss the cross claims against Premier and Option One.
[5] Albice/Teccas also argue that Premier lacked authority to conduct the foreclosure sale because it did not qualify as a trustee under the Act without a corporate officer residing in Washington at the time of the sale. RCW 61.24.010(1)(a). Because we reverse on other grounds, we decline to address this issue.
[6] The Dickinsons contend that Albice/Teccas cannot, for the first time on appeal, argue that they tendered funds sufficient to cure the default prior to the sale or that the trustee's deed contained insufficient recitals. But both issues were before the court on summary judgment. Albice/Teccas argued that they tendered the final amount due to the lender 14 days prior to the sale in their original motion for summary judgment. The Dickinsons argued that "Dickinson, as a bona fide purchaser for value, was entitled to rely on the recitals made by the trustee in the deed." CP at 545. In reviewing summary judgment, we engage in the same inquiry as the trial court. Morin v. Harrell, 161 Wash.2d 226, 230, 164 P.3d 495 (2007). Whether the recitals in the deed of trust are sufficient for Dickinson to rely on is a necessary step in deciding whether Dickinson is entitled to the protection of RCW 61.24.040(7).
[7] In fact, the final payment arguably triggered the statute that requires a trustee to discontinue a sale where the borrower tenders a cure for the default 11 days before the sale. RCW 61.24.090(3). Even if the Teccas were short the trustee's expenses as required by RCW 61.24.090(1)(b), the trustee had a fiduciary duty to notify the Teccas of any additional costs or fees due after they tendered the last payment under the forbearance agreement more than 11 days before the scheduled sale. RCW 61.24.090(1)(a), (3).
[8] Notably, Option One's alleged letter of January 31 notified the Teccas that the February 16 sale would take place because they had breached the forbearance agreement, not the original note.
[9] Washington State already affords purchasers broader protections than many other states by providing a conclusive presumption of compliance in favor of bona fide purchasers in all aspects of foreclosure. Grant Nelson and Dale Whitman, Reforming Foreclosure: The Uniform Nonjudicial Foreclosure Act, 53 Duke L.J. 1399, 1505 (2004).
[10] The forbearance agreement appears to permit indefinite continuances. See CP at 467 ("Lender shall retain the right to continually postpone the foreclosure ..."). But a contract that conflicts with statutory requirements is unenforceable as a matter of law. Pierce County v. State, 144 Wash. App. 783, 841, 185 P.3d 594 (2008). Regardless of the terms in the agreement, Premier did not have the authority to continue the sale beyond the 120-day statutory limit.
[11] Because this procedural flaw renders the sale void, we need not consider whether it is also void because the trustee failed to set forth facts in the deed showing the true status of the Teccas' default, if any.
[12] Albice/Teccas' expert witness, a certified general appraiser in Washington State, testified that the property was worth $950,000 in February 2007. Karen Tecca stated in her declaration that the property had a value in excess of $750,000. Her estimate was based on a 2003 appraisal of the property at $607,000, assuming that it had substantially appreciated. In their brief, the Dickinsons argue that fair market value of the property was approximately $428,000. Based on this record, the purchase price was between 13-18 percent of its fair market value. In considering the bona fide purchaser issue, the disparity between what Dickinson paid and the true value of the property strongly supports our conclusion that Dickinson should have further investigated the sale. See Restatement (Third) of Property: Mortgages § 8.3 cmt. b (1997) (a court is generally warranted in invalidating a sale where the price is less than 20 percent of fair market value).
[13] And $450,000 was probably already a significant underestimation of the property's fair market value. Purchasers reasonably anticipate lower prices at a foreclosure sale because properties sold at a foreclosure auction are "simply worth less." Resolution Trust Corp., 511 U.S. at 539, 114 S.Ct. 1757.
[14] To set aside a sale on the grounds of chilled bidding, the challenger to a sale must establish that bidding was actually suppressed with affirmative, factual evidence. Country Express Stores, 87 Wash.App. at 749, 943 P.2d 374. Albice/Teccas do not argue that the sale should be set aside on these grounds alone; rather, the chilled bidding is an additional unfair circumstance in support of setting aside the sale on the grounds of inadequate price. In this case, they need not prove actual suppression.
[15] In addition to paying the default amount, the Teccas also needed to pay the expenses and costs incurred by the trustee. RCW 61.24.090(1)(b).
[16] Under the forbearance agreement, the Teccas contracted to pay Option One. But it would be disingenuous to suggest that payment to Option One did not put Premier on notice of the Teccas' attempt to cure the default. As noted above, Premier and Option One are closely affiliated, sharing access to the same loan information, including foreclosure payments. Lisa Clary, an Option One employee designated as Premier's representative in this action, stated that she knew the Teccas' final payment under the agreement was tendered late and rejected. Moreover, the signatory of the Deed of Trust, Kim Thorne, was employed by Option One. Thus, Premier was on notice, either actual or constructive, that the Teccas tendered their final payment under the forbearance agreement.